JETT & CO. *v.* UNITED STATES (No. 3289)[1]

[1] T. D. 44044.

United States Court of Customs and Patent Appeals, May 12, 1930

*Brooks & Brooks* (*Ernest F. A. Place* of counsel) for appellant.
*Charles D. Lawrence*, Assistant Attorney General (*James R. Ryan* and *Oscar Igstaedter*, special attorneys, of counsel), for the United States.
*Blackman, Pratt & King* (*Addison S. Pratt* of counsel) *amicus curiæ*.

[Oral argument April 18, 1930, by Mr. Place and Mr. Igstaedter]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court overruling the protests of appellant herein.

The merchandise consists of certain machines which were classified by the collector and assessed for duty at 35 per centum ad valorem under the provision of paragraph 372, Tariff Act of 1922, reading: "all other textile machinery or parts thereof, finished or unfinished, not specially provided for, 35 per centum ad valorem."

Appellant protested, claiming the merchandise to be properly dutiable at 30 per centum ad valorem under the provision of said paragraph 372 reading: "all other machines or parts thereof, finished or unfinished, not specially provided for."

The lower court overruled the protests, and sustained the classification of the collector.

A brief signed by the firm of Blackman, Pratt & King, attorneys for the Celanese Corporation of America, and Addison S. Pratt, of counsel, acting as *amicus curiæ*, was filed in this case and has been considered by us.

The pertinent provisions of said paragraph 372 read as follows:

PAR. 372. * * * knitting, braiding, lace braiding, and insulating machines, and all other similar textile machinery or parts thereof, finished or unfinished, not specially provided for, 40 per centum ad valorem; all other textile machinery or parts thereof, finished or unfinished, not specially provided for, 35 per centum ad valorem; * * * all other machines or parts thereof, finished or unfinished, not specially provided for, 30 per centum ad valorem; * * *.

There is but one question before us for determination and that is whether the merchandise in issue is "textile machinery or parts thereof." If it is not, the Government concedes that the protests of appellant should be sustained.

We think that the machines are correctly described in the opinion of the court below as follows:

It appears from the record that the machines under consideration are integral parts of an installation which treats raw material, cotton linters, through various

stages to produce a yarn used in the production of textiles. The entire plant consists of pipe lines, pumps, motors, and numerous individual machines, some of which are of American manufacture and others imported.

The particular machines involved herein receive the material after it has been cleaned and washed and subject it to heating, bleaching, refining, and other chemical processes to obtain a material which is further processed by machines of American manufacture ultimately producing a yarn used in the manufacture of textiles.

The functions performed by the machines in issue are described in appellant's brief as follows:

The testimony shows that cotton linters are taken as a raw material, and are subjected to treatments of washing and bleaching, for the purpose of removing most of the noncellulose contents, before the material resulting from those treatments is used in an imported device.

The cotton linters, which have been subjected to such preliminary and preparatory treatments, are then immersed in a solution of chemicals in one of the imported devices (Exhibit 1, Record, p. 44), which consists of a large tank or "kier" and a "preheater," which are connected to each other by pipe lines, through all of which the liquor is kept in circulation by means of an electrically driven pump. The complete device was imported. The result of the operation of this device, and that of another device, not in issue, to remove water from the material, is Illustrative Exhibit D.

Then the second of the imported devices (Exhibit 2, Record, p. 47) is used to stir or to agitate the material in a tank with a vertical shaft upon which are paddles which rotate between fixed arms on the tank. The complete device was imported; the result of its operation is Illustrative Exhibit E.

The material is then subjected to similar treatment in another imported device of similar construction (Exhibit 3, Record, p. 48). The complete device was imported; the result of its operation is the same as that of Exhibit 2, except it is "more refined."

The material then "goes through several other tanks and clarifying machines," which were not imported, after which it is subjected to treatment in the next two imported devices (Exhibits 4 and 5, Record, pp. 50 and 51), which are very large power-driven mixers that work on the same principles as Exhibits 2 and 3. They are used to make the material more uniform by mixing together several batches from previous processings. Both of them are imported complete; their ultimate product is shown by Illustrative Exhibit G.

Illustrative Exhibit G is "the copper-ammonia solution with cellulose, which is now finished" (Record, p. 52). It is ready to be formed into filaments. Up to this point the operations have been essentially chemical; they have been induced, facilitated, hastened, or perfected by the physical treatment in the various mechanical devices. Although the underlying principles of the cuprammonium process are well known to those versed in artificial silk technology, the witness did not care to disclose, for obvious reasons, the exact manner in which it is carried out in his factory.

The material is then manipulated in another imported device, a so-called spinning machine (Exhibit 6, Record, p. 53). The function of this machine is to force the material represented by Illustrative Exhibit G through small orifices into a coagulating bath and the resulting filaments are stretched and reeled. This device was also imported complete. The result of its operation is shown by Illustrative Exhibit I.

Illustrative Exhibit I shows the condition of the material at the stage to which it has been processed by using all of the imported devices and some other devices

not in issue. In that condition it is processed only partially; it is not artificial silk; it is not a commercial salable product; it will not remain in that condition very long because of the destructive effect of chemicals still present and which have to be removed by further processing. The testimony and exhibits explain the subsequent steps in processing the material to the point of its becoming, ultimately, artificial silk yarn.

We would first observe that it is conceded, and the testimony clearly shows, that none of the machines in question is used for the purpose of washing, cleaning, or bleaching the cotton linters which are the raw material employed in the manufacture of artificial silk yarn, which is clearly a textile material. Therefore the case of *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. 459, T. D. 43916, in which it was held that certain machines used in cleaning wool were not textile machines, does not in any way aid appellant's contention that the machines in issue are not textile machines.

The cotton linters, which are the raw material for the manufacture of artificial silk yarn, are textile fiber. After this fiber is subjected to treatments of washing and bleaching, it is immersed in one of the machines in issue, and through successive processes, in some of which the machines in question are used, and in others machines of domestic manufacture are used, artificial silk yarn is produced. The last process performed by one of the machines in issue results in a filament which is stretched and reeled. From this point on, the manufacturing processes resulting in artificial silk yarn are produced by machines other than those here in issue.

Appellant contends that the machines in issue are used in creating fibers, by chemical methods, and that after such artificial fibers are produced, other machines operate upon those fibers to fabricate them into yarn, and inasmuch as no textile fiber is in existence at the point where the machines in issue have completed their work they can not be held to be textile machinery.

The argument of appellant is persuasive but not convincing. In the case of *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490, this court had under consideration the construction of paragraph 372 and said:

It will be noted that the provision for "all other textile machinery or parts thereof, finished or unfinished, not specially provided for," in paragraph 372, *supra*, immediately follows the provision for "knitting, braiding, lace braiding, and insulating machines, and all other *similar textile machinery or parts thereof.*" (Italics ours.)

Obviously, the provision was not intended to be limited in its operation to textile machinery of any particular kind, or to that which produced woven fabrics. It was intended, we think, to be sufficiently comprehensive to cover *all* textile machinery not otherwise specially provided for, and *certainly includes machines which are used in the manufacture of textile materials.*

In the above quotation, the last italics in the last sentence have been supplied.

This holding that textile machinery includes machines which are used in the manufacture of textile materials was affirmed in *Passaic Worsted Co. et al.* v. *United States, supra.* The court, after making the quotation from the *Whitlock* case, as above quoted, said:

> We thus expressed the opinion that the phrase "all other textile machinery" includes machines which are used in the *manufacture* of textile materials.
>
> If this be the test, and we think it is, are the machines imported here used in the *manufacture* of textile materials?

We think that the foregoing expresses the proper construction of the words "textile machinery" as used in said paragraph 372; and, applied to the facts in the case at bar, the machines in issue are clearly textile machinery. They are used exclusively in the manufacture of artificial silk, which is of course a textile material. The process performed by each of the machines is essential in the manufacture of such material. In our opinion it is wholly immaterial that the processes resulted in the creation of a new fiber. The raw material utilized in the beginning is a textile fiber. The manufactured article, the result of a large number of processes between the raw textile fiber and the finished product, is artificial silk yarn. Thus the manufacturing processes begin by utilizing a textile fiber and end with an artificial silk yarn. It is immaterial whether in such processes the original fiber has been destroyed and a new fiber created. It is likewise immaterial that the machines in question do not perform all of the manufacturing processes necessary in the production of the yarn. All of them were used in its manufacture. The manufacture of the yarn begins with one of the machines in question and the sole end of the processes employed is the production of artificial silk yarn.

We hold that the machines in issue are used in the manufacture of a textile material. They are therefore textile machinery and were properly classified by the collector.

The judgment of the Customs Court is *affirmed.*