. UNITED STATES *v*. FLOREA & CO., INC. (No. 4120)[1]

United States Court of Customs and Patent Appeals, January 24, 1938

*Joseph R. Jackson*, Assistant Attorney General (*Marcus Higginbotham, Jr.*, and *Ralph Folks*, special attorneys, of counsel), for the United States.
*Sidney A. Florea* (*Sol A. Rosenblatt* of counsel) for appellee.
*Frank W. Mondell* (*William H. Mondell* of counsel), *amicus curiae*.

[Oral argument December 6, 1937, by Mr. Folks, Mr. Florea and Mr. William H. Mondell]

Before BLAND, Acting Presiding Judge, and HATFIELD, GARRETT, and LENROOT. Associate Judges

BLAND, Acting Presiding Judge, delivered the opinion of the court:
This appeal involves the proper classification for customs duty purposes of knitted, woolen gloves imported from Japan. The collector classified the merchandise under paragraph 1114 (b) of the Tariff Act of 1930 and assessed the same with a duty of 40 cents per pound

---
[1] T. D. 49396.

and 35 per centum ad valorem, based upon the American selling price of the domestic equivalent. The American selling price value is applicable, if the merchandise is classifiable under paragraph 1114 (b) and is worth not more than $1.75 per dozen pairs (which latter fact the collector found), by virtue of a Presidential proclamation of February 21, 1936, T. D. 48183, 69 Treas. Dec. 393, which proclamation was made following a resolution in the United States Senate, No. 178 of August 19, 1935, directing the Tariff Commission to investigate the cost of production of knit woolen gloves, etc.

The importer protested the said classification under paragraph 1114 (b) and the collector's assessment of the same with duty as aforesaid and claimed that the merchandise was dutiable under paragraph 1529 (a) as "articles embroidered" at 90 per centum ad valorem.

The United States Customs Court, First Division, sustained the protest and the Government has appealed from the trial court's judgment.

The pertinent provisions of the involved paragraphs of the Tariff Act of 1930 follow:

PAR. 1114 * * * (b) Hose, half-hose, gloves, and mittens, finished or unfinished, wholly or in chief value of wool, valued at not more than $1.75 per dozen pairs, 40 cents per pound and 35 per centum ad valorem * * *.

PAR. 1529 (a). * * * and fabrics and articles embroidered. * * * all the foregoing, and fabrics and articles wholly or in part thereof, finished or unfinished (except materials and articles provided for in paragraph 915, 920, 1006, 1111, 1504, 1505, 1513, 1518, 1523, or 1530 (e), or in Title II (free list), or in subparagraph (b) of this paragraph), by whatever name known, and to whatever use applied, and whether or not named, described, or provided for elsewhere in this Act, when composed wholly or in chief value of filaments, yarns, threads * * * 90 per centum ad valorem. * * *

The gloves at bar are wool knit gloves made in various colors. Collective Exhibit 1, which consists of eighteen gloves, was received in evidence as representative of the importation involved. Seventeen of the items in the exhibit are quite similar, in respects with which we are here concerned, and one of the items, to which reference will later herein be made, differs from the other seventeen so as to require a separate description. Each of the seventeen items contains stripes running crosswise of the glove, which stripes are in various colors. On the back of each of seventeen of the gloves, after they were finished in Japan, small figures or characters were stitched. In most instances the stitching is placed between the stripes, and the woolen threads with which the figures are made differ from each other in color and contrast in color with the predominant color of the gloves. Generally speaking, the characters of the seventeen gloves consist of from two to eight superimposed stitches, which stitches usually touch and, to some extent, overlap each other and show on the surface of the glove for a distance of about one-sixth of an inch. The glove

above referred to which differs from the other seventeen is of solid green color, on the back of which are four superimposed bars of the same color as the glove. · The bars are about three-quarters of an inch long and have the appearance of having their ends only fastened to the glove. They stand out in relief in rather an unusual degree and each has the appearance of being composed of a considerable amount of yarn wrapped around a center yarn thread. It seems obvious that these bars were not put upon the glove to lend color as is true in all the other items in the exhibit. They do, however, ornament and embellish the glove. According to the record the bars were made, after the glove was finished, by a hand needle operation as was the stitching on the other seventeen articles. A witness stated that the stitching was put on, by hand, "with a needle and thread, like a French knot, called a wheat stitch." The superimposed stitching on all the gloves was done by girls in the factory in Japan after the gloves had been otherwise finished.

The importer produced several witnesses, most of whom, after describing the stitching and stating its purpose and manner of production, testified to the effect that, in their opinion, the stitching constituted embroidery. Some of the witnesses had much experience with embroidery work and others had had no such experience as would, under any circumstances, entitle their expressions of opinion to be given very much weight. Some of them recited many different facts concerning embroidery and gave their definitions of the term. Illustrative of these definitions so given is that of witness Einstein which is as follows:

Embroidery is produced by a needle with threads of various materials, superimposed on a foundation, thereby enhancing the intrinsic value and also the artistic value of such foundation.

The Government also produced a number of witnesses, some of whom had had, in this country, a great amount of experience in manufacturing (and some of them in manufacturing and selling) woolen knit gloves similar to those imported. One of the Government's witnesses manufactured gloves which he stated were "identically the same," "exactly the same" (except in respects with which we are not concerned here) as those imported. One American manufacturer stated that the Japanese manufacturer had probably copied the American-made glove; that in this country the stitching comparable to that which the importer claims to be embroidery was placed upon the glove by machinery. All of the Government's witnesses who testified on the subject stated that in their opinion the stitching in controversy did not constitute embroidery. One witness stated that in this country customers had become tired of stripes of different colors and that the stitching referred to was to add additional color to the glove. (This testimony as to color evidently was directed only to

the seventeen gloves first above described.)  Samples of American-made woolen gloves which the Government's witnesses regarded as having been embroidered were also introduced.

One of the Government's witnesses, when asked why the stitching on the imported gloves did not constitute embroidery, stated:

This stitch isn't in relief, or raised stitching.  What we call embroidery is raised, and must show artistry and dignity, and have a design.  For it to be embroidery it has to have some design placed on the fabric to call it embroidery.

Further defining "embroidery" he said:

What I call embroidery is any stitch, or any group of stitches that are raised; and they must be in relief, and they must have sufficient design, with artistry and dignity, to raise it to the designation of embroidery.

The other Government witnesses expressed substantially the same view as to what constituted embroidery as is indicated by the last above-quoted testimony.

In deciding the case, Judge Brown wrote an opinion in which Presiding Judge McClelland concurred by a special concurring opinion. Judge Brown held that the—

preponderance of the testimony here of the witnesses called by both parties * * * establishes that the stitching in question was superimposed on the completed gloves by hand with a needle, resulting in an ornamental decoration which added to the attractiveness and salability of the imported gloves, bringing same within the common meaning of the term embroidery.  * * *

He then concluded:

* * * We therefore hold on the weight of the evidence that the stitching here involved constitutes embroidery, and the imported gloves here in question embroidered articles * * *.

Presiding Judge McClelland stated that he had serious doubt as to whether the stitching constituted embroidery, under the definitions of that term, or that it constituted an ornamentation or embellishment, but concluded that in deference to the ruling of this court in *Michaelian & Kohlberg, Inc.* v. *United States*, 22 C. C. P. A. (Customs) 551, T. D. 47554, he would concur in the conclusion reached by Judge Brown.

In this court, the Government and the appellee have fully briefed the single issue involved.  Also, there was filed by Frank W. Mondell, as *amicus curiae*, a very thorough brief on behalf of the Association of Knitted Glove Manufacturers, Inc., to which appellee filed a reply brief.

It is noted that in the brief of the Government and of *amicus* no dictionary definitions of the term "embroidery" have been presented. The Government and *amicus* rely upon the testimony in the case, as did Judge Brown, and upon language used in certain court decisions.

As the question is presented to us, we must apply the common meaning of the term "embroidery" in reaching our decision.  It

is not contended by anyone that a commercial meaning of the term "embroidery," differing from its common meaning, has been established.

We here set out the definitions of "embroidery" quoted in appellee's brief:

> Ornamental work done by a needle on cloth, canvass, leather, etc.
>
> Also the art of producing such ornamentation on the fabric ornamented.
>
> 2. Any varigated or elaborate ornamentation especially after the needle work, adornment, embellishment * * *.—*Funk & Wagnalls New Standard Dictionary*.
>
> The ornamentation of textile fabrics and other materials with needle work.—*Encyclopedia Britannica*.
>
> The art of producing by needle and thread, the ornamental designs upon cloth or fabrics.
>
> The term "Embroidery" is always applied to a completed fabric * * *.—*New International Encyclopedia*.
>
> *Summary of Tariff Information, 1921,* relative to bill H. R. 7456, p. 1157, repeated in the Summary of Tariff Information, 1929, * * * vol. 2, p. 2027.—Embroidery is ornamental stitching.

At this point it may be observed that in cases like the one at bar, courts may give consideration to, and often are aided by, the testimony of competent witnesses with reference to the common meaning of a term when applied to the particular merchandise under consideration. It is well settled, however, that courts are not, under such circumstances as are at bar, bound by such testimony, but will ordinarily chiefly rely upon decisions of the courts and upon the definitions found in dictionaries and other lexicographical authorities. *F. W. Myers & Co. (Inc.)* v. *United States,* 16 Ct. Cust. Appls. 171, T. D. 42794. The reasons for this practice are not obscure. It quite often happens that the opinions of witnesses are prompted by bias or personal interest. It also frequently occurs, as it has here, that the opinions of the witnesses of one of the parties involved are in direct conflict with those of the other party.

It has long been conclusively settled that the common meaning of a term is not an issue of fact but is a matter of law. *Marvel* v. *Merritt,* 116 U. S. 11; *United States* v. *North American Mercantile Co.,* 17 C. C. P. A. (Customs) 378, T. D. 43820.

In arriving at the meaning of the term "embroidery" in tariff statutes the courts have laid down many different definitions thereof. In some instances such as in *Kayser & Co. (Inc.) et al.* v. *Pevny; United States Impleaded,* 13 Ct. Cust. Appls. 479, T. D. 41368, the definition in Webster's New International Dictionary is quoted as follows: "needlework used to enrich textile fabrics, leather, etc." This is a very broad definition and omits a number of limitations which are found in definitions elsewhere relied upon. It is interesting to note that in the *Kayser & Co. (Inc.) et al.* case, *supra,* this court

also quoted a definition from *United States* v. *Field & Co.*, 10 Ct. Cust. Appls. 183, T. D. 38550, as follows: "To constitute an embroidery there must be, by needlework processes, an ornamental addition superimposed upon a previously completed fabric or article."

From all the authorities examined, the definition of the term "embroidery," when used in a tariff act, ordinarily requires that for a thing to be embroidered there must be an ornamental, superimposed stitching which is the result of needlework. Some of the definitions require that the stitching must be superimposed upon a previously completed fabric or article and this consideration is of special importance when the stitching finishes or helps to finish the article and has a direct bearing upon the intended purpose of the stitching. Since it is conceded that the gloves at bar were finished articles before being additionally stitched, we need give no further consideration to this phase of the definitions.

In the record in this case much emphasis has been placed upon the fact that the additional stitching was done by hand with needle and thread. Since it is a matter of common knowledge that embroidering may be done by machinery which employs needles and threads, we do not see why the handwork character of the disputed stitching becomes material except insofar as it suggests, under the circumstances of this case, that the stitching was superimposed, not in making the glove, but as additional work upon it.

After giving the evidence in this case such weight as we think it is entitled to and after considering the definitions found in the dictionaries and other authorities, it is our view that the imported merchandise is embroidered. It is not necessary to hold here that every ornamental dot, stitch or stitching placed upon a textile or a textile article without a predetermined design constitutes embroidery. It is clearly shown in this record that in Japan, and here, ornamentation like that at bar is added to finished gloves and is done in pursuance to definite instructions, and predetermined designs. As before stated, in order that a given stitching be regarded as embroidery, it is essential that it should be ornamental and it is doubtful if it could be regarded as ornamental unless the embroidery consists of a superimposed, raised effect, brought about by stitching some character, which by reason of its shape, color or other characteristic, in fact adds ornamental value to the article. Usually embroidery is not only made pursuant to a predetermined plan but it consists of an arrangement of characters, ornamental in effect, as distinguished from a random or haphazard placing of stitches. This court said in *United States* v. *Grass Brothers*, 13 Ct. Cust. Appls. 33, T. D. 40866: "Embroidery is made by stitching, but all stitching is not embroidery."

In *United States* v. *Field & Co., supra,* concerning embroidery this court said:

\* \* \* Therefore we think it is clearly inferable that to constitute an embroidery there must be by needlework processes an ornamental addition superimposed upon a previously completed fabric or article. \* \* \*.

In *United States* v. *Monroe Forwarding Co.,* 18 C. C. P. A. (Customs) 42, T. D. 44006, where embroidered cotton gloves were under consideration the court said:

\* \* \* It is true that the ornamentation is not as elaborate as some designs used on more expensive gloves; nevertheless, it serves no purpose other than that of adornment, and, as it consists of ornamental needlework, is, in our opinion, embroidery.

This court, when considering questions similar to the one presented here, frequently has referred to an early decision of the Circuit Court for the Southern District of New York in *United States* v. *Waentig,* 168 Fed. 570 (affd. in 174 Fed. 1023), where Holt, District Judge, stated:

\* \* \* On the merits, I think the test of whether an article is embroidered is whether the needlework upon it serves an ornamental purpose. If it simply serves a useful purpose, it does not seem to me that any one would term it embroidery. The fundamental idea of embroidery seems to be that it is needlework done upon a previously completed fabric, as distinguished from tapestry or lace work, in which the design is a part of the original fabric, and the idea that it shall be ornamental also seems to be essential to the definition. All the dictionary definitions include the idea that embroidery is ornamental work, as shown by the following definitions:
The Century Dictionary:
"Embroidery: 1. The art of working with the needle raised and ornamental designs in threads of silk, cotton, gold, silver, or other material, upon any woven fabric, leather, paper, etc. 2. A design produced or worked according to this art."

*Michaelian & Kohlberg, Inc.* v. *United States, supra,* is a comparatively recent decision by this court. That case involved oriental rugs. A figure, said to represent a Chinese dragon, made by stitching, was placed on one end of the basic fabric of the rug, which fabric extended about one inch beyond the pile. The design was about five inches in length, made of irregular stitching, was more or less in outline, and had two small blackish dots of velvety material which were claimed to represent the dragon's eyes. Notwithstanding the fact of the crudeness of the stitching, the place where it was located, and the article upon which it was placed, this court held that it was embroidered and quoted with approval from the case of *United States* v. *A. A. Vantine & Co.,* 166 Fed. 735, which held that "\* \* \* it is not necessary that the design should be regular, conventional, or highly ornamental; \* \* \*." We further said:

The great difficulty which arises in applying this principle, however, grows out of the almost inevitable disposition to measure the work by the individual taste

of the observer. This is not a rule which may be always followed with safety in the classification of merchandise if consistency in the administration of the customs laws is to prevail.

We know of no authority (certainly none has been presented to us) which warrants a conclusion that for a thing to be embroidery it must respond to all the requirements of the definition of the Government's witness which is above quoted. Embroidery might possess "artistry" and as far as we know the term "dignity" might not be inappropriate in referring to certain embroideries, but, following the same line of reasoning as in *Michaelian & Kohlberg, Inc.* v. *United States, supra,* we think it would be unsafe and impracticable for customs officers and courts to be required, in cases like that at bar, to measure and ascertain the merits of an ornamented article with respect to "artistry" and "dignity." As before stated, the term "embroidery" implies that it ornaments. If it artistically ornaments and if the ornamentation may be said to possess dignity, it speaks for the superior quality of the embroidery and suggests the degree or extent to which the article has been ornamented. This same thought, though differently expressed, has frequently occurred in court decisions respecting works of art.

One of the cases particularly relied upon by the Government is *Kayser & Co. (Inc.) et al.* v. *Pevny [etc.], supra,* which involved sueded, warp-knit cotton fabric gloves. They were held not to be embroidered. The gloves there in question had a ribbed or raised effect in relief on the back which was known as "points" and extended backward from the glove fingers. The points were not composed of stitches but were made by crimping or creasing the glove fabric and sewing it together with a plain stitch. In one of the exhibits there were two lines of stitches close to, parallel with, and on each side of each point. The purpose of the stitching along the sides of the points was decorative but it was without design and not superimposed. No raised effect was produced from the two small threads stitched through the fabric. The court held that no ornamental effect was produced thereby and that the stitches did not constitute embroidery. It is obvious from the statement of the facts in that case that our conclusion there has no bearing on the issue at bar.

It seems clear to us that when we apply the above-stated definitions, found in the various authorities and in the pronouncements of the courts on the subject of embroidery, it must necessarily be concluded that in each of the eighteen gloves forming Collective Exhibit 1, the ornamental, superimposed threads here in controversy constitute such needlework by stitching as to respond to the term "embroidery." That it is superimposed cannot be questioned. The stitches are arranged systematically in accordance with a predetermined design, are on top of the knitted yarns of the glove, and have a raised or relief

appearance. In seventeen of the items the color of the stitches contrasts with their immediate surroundings. That the stitching on each of the gloves ornaments them in a desirable way and increases their attractiveness and salability is conceded. It is not claimed by any one that the stitching was intended to have or does have any purpose other than to ornament the articles.

The Government has emphasized here, as it did in the trial below, the contention that the disputed ornamentation is not embroidery since the so-called design on the surface of the glove is not identically transmitted to the inner surface. It is true that the testimony of some of the Government's witnesses was to the effect that all embroidery possesses this feature. Other witnesses stated, however, that even if the stitching did not show on the inner side, this fact would not prevent the stitching from being embroidery. One witness stated that machine stitching ordinarily "transmits the design from the right side more closely than in hand embroidery." We know of no authority that holds that a given superimposed ornamentation is not embroidery solely because the design is not transmitted to the opposite side.

*Amicus curiae* has discussed the subject of legislative sanction of judicial interpretation in connection with a discussion of legislative history. We have given this question careful consideration and find nothing in the legislative history that suggests the correctness of the contentions of *amicus* in this respect. We are of the opinion that nothing has been suggested here that would warrant resorting to the doctrine of legislative adoption of judicial construction in the decision of the issue here presented. In view of the decisions above referred to and of our interpretation thereof, the application of the doctrine would obviously not produce the result which *amicus* contends for.

The United States Customs Court properly sustained the importer's protest and its judgment is *affirmed*.